# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNDA LYNN JONES, | Case No. 1:17-cv-00846-SAB |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 15, 18) |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Lynda Lynn Jones ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from sinusitis, history of urticarial, hypertension, hypothyroidism, hyperlipidemia, history of mastoiditis, history of stomatitis, mild degenerative joint disease to the knees, headache, gastro-esophageal reflux disease, history of lateral epicondylitis, history of transverse non-displaced fracture of mid-5th phalangeal bone of her left foot, ganglion versus synovial cyst of the right wrist, history of internal hemorrhoids, tendinitis, major depressive disorder, anxiety disorder, right shoulder degenerative joint disease status-post stabilization

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

surgery, fibromyalgia, asthma, rheumatoid arthritis, degenerative disc disease, and obesity.  For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff previously filed an application for a period of disability and disability insurance benefits on June 30, 2010, and a Title XVI application for supplemental security income on June 18, 2010.  The claims were initially denied on December 11, 2010.  Plaintiff did not request reconsideration so the decision became final.

Plaintiff previously filed an application for a period of disability and disability insurance benefits on June 20, 2013, that was denied on July 15, 2013.  (AR 154-156, 231-232.)

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on June 28, 2013.  (AR 233-239, 240-249.)  Plaintiff alleged a disability onset date of April 1, 2010.  (AR 233, 240.)  Plaintiff's applications were initially denied on November 19, 2013, and denied upon reconsideration on March 20, 2014.  (AR 158-160, 161-163, 167-171, 173-177.)  Plaintiff requested and received a hearing before Administrative Law Judge Danny Pittman ("the ALJ").  Plaintiff appeared for a hearing on October 20, 2015.  (AR 39-83.)  On December 30, 2015, the ALJ found that Plaintiff was not disabled.  (AR 17-33.)  The Appeals Council denied Plaintiff's request for review on March 3, 2017.  (AR 1-3.)

### A.    Hearing Testimony

Plaintiff appeared with counsel and testified at a hearing on October 2015.  (AR 43-76.)  Plaintiff was born on May 13, 1982.  (AR 43.)  She is 5 feet 4 inches tall and weighs 278 pounds.  (AR 43.)  Plaintiff is married and lives with her husband and two children: one age twelve-years, and one nine-month old.  (AR 43-44.)  Plaintiff receives child support, food stamps, and MediCal.  (AR 44.)  Plaintiff attended regular classes in high school and graduated.  (AR 45.)  She is able to read and write.  (AR 45.) Plaintiff graduated from Madera Beauty College and got a cosmetology license in 2012 or 2013.  (AR 45.)  She did not work as a cosmetologist because she was having trouble with her shoulder and arm.  (AR 50.)

Plaintiff worked at Taco Bell in 2012.  (AR 45.)  She had a problem with a supervisor and walked out.  (AR 45.)  She was working full-time, and also had shoulder surgery so was limited on what she could do.  (AR 46.)  Plaintiff worked at Taco Bell in 2000.  (AR 47-48.)  Plaintiff was a full-time sales associate at Party Concepts in 2001.  (AR 48.)  She helped customers, did sales, and stocked.  (AR 48.)  Plaintiff worked full-time seasonally as a lift operator and in the kitchen at Bear Mountain in 2002.  (AR 48.)  She cooked, cleaned, and helped customers.  (AR 48.)  She worked full-time in 2006 at Exciting Lighting and Home Décor.  (AR 49.)  The business was primarily internet sales and she would stock the floor, ship sales, and help customers.  (AR 49.)  Plaintiff worked there several years, but got into a conflict with a co-worker and the manager and was fired.  (AR 49.)  Plaintiff's assistant had gotten a raise and the manager was her sister-in-law and told her they went to dinner to plan how the assistant could get her job.  (AR 49.)  At the same time, Plaintiff was working one or two days a week for a rental agency.  (AR 75-76.)  She would answer the phone and assist renters.  (AR 76.)  Plaintiff had also owned a business with her ex-husband after she had her first daughter in 2003.  (AR 76-77.)  She managed the business.  (AR 76.)

Plaintiff has a driver's license and drives every day.  (AR 44.)  Plaintiff drives a stick shift.  (AR 71.)  She picks her daughter up from school almost every day.  (AR 71.)  It is 15 minutes each way.  (AR 71.)  Plaintiff gets up in the morning and takes her medicine.  (AR 58.)  She takes care of her daughter, feeding her breakfast.  (AR 58.)  She feeds their dogs and cats.  (AR 58.)  She takes care of her daughter and does the dishes.  (AR 58.)  She will do the laundry if there is any that needs to be done.  (AR 58.)  She will fold clothes or do other things that need to be done.  (AR 58.)  If she has a doctor's appointment, she will go to that.  (AR 58.)  She will make dinner with the help of her twelve-year old.  (AR 58.)  Her twelve-year old will usually give the baby her bath. (AR 58.)

Plaintiff's daughter goes to school until 12:30 every day and her husband works.  (AR 58.)  Plaintiff cares for the baby by herself when they are gone.  (AR 58.)  Occasionally, she will have a problem but she is able to handle it.  (AR 58.)  Sometimes she will call her husband if she is upset or the baby cries and she will go to a different room.  (AR 58-59.)

Plaintiff is unable to work because she has trouble concentrating and has a lot of physical issues.  (AR 50.)  She gets very emotional easily, has trouble concentrating and remembering things.  (AR 50.)  Plaintiff has trouble falling asleep because so much is running through her mind she cannot settle down.  (AR 59.)  She has been taking medication to help her sleep for the last few months and she does not wake up when the baby cries so her husband has had to get up a few times with the baby.  (AR 59.)  Plaintiff sleeps about six hours a night.  (AR 59.)  Plaintiff does not take naps during the day.  (AR 59.)  She would like to but cannot because of the baby.  (AR 59.)  It is not so much Plaintiff's physical symptoms that keep her from working, it is her mental issues.  (AR 70.)

Sometimes Plaintiff's husband will help her wash her hair or scrub her back.  (AR 59.)  He will help buckle or unbuckle her bra because she cannot reach behind her back.  (AR 59.)  Plaintiff prepares meals, washes the dishes, and uses a dust buster on the floor.  (AR 59-60.)  Her husband and daughter will sweep and mop.  (AR 60.)  Plaintiff cleans the bathrooms.  (AR 60.)  Her husband and daughter take out the trash.  (AR 60.)  Plaintiff pays the bills and goes grocery shopping with her daughter or her husband.  (AR 60.)  Plaintiff goes to girl scouts with her daughter, usually just dropping her off.  (AR 61.)  At least half the day, Plaintiff is laying down or sitting with her feet up.  (AR 71.)  The television is always on and she will be paying bills or watching television.  (AR 71.)

Plaintiff has dinner with her husband's family.  (AR 61.)  She last went to the movies about three years ago.  (AR 61.)  She goes out to restaurants more frequently.  (AR 61.)  Plaintiff goes tent camping once a year to the San Joaquin River.  (AR 61.)  She goes fishing a couple times a year.  (AR 61-62.)  Getting ready to go fishing is very stressful.  (AR 66.)  Sleeping outside is uncomfortable and she uses an air mattress.  (AR 66.)  She will usually be the first one to bed.  (AR 66.)  Other people do the cooking and cleaning.  (AR 66-67.)  She mainly sits by the water or in the water visiting.  (AR 67.)  She will fish for about an hour in the weekend.  (AR 67.)

Once in a while, she will take a walk.  (AR 61.)  She will walk around the neighborhood or to the park.  (AR 62.)  She will walk ten to fifteen minutes.  (AR 62.)  Plaintiff uses a

computer to shop, pay her bills, and manage her bank account. (AR 62.) Plaintiff likes making bows, sewing, cross stitch, reading, and crafts but does not do them very often. (AR 62.) The prior month. Plaintiff make a bow basket for a boy with cancer and donated it. (AR 62.)

Plaintiff did not take pain medication while she was pregnant with her nine-month old. (AR 50.) She was taking a lot of Tylenol. (AR 50.) Plaintiff was in so much pain that they induced her a week early. (AR 51.) The medication that she is currently taking takes the edge off her pain enough so that she can function. (AR 51.) If she tries to do something that she should not do then later in the day or the next day she will be in more pain. (AR 51.) Plaintiff has pain in her lower back and both knees hurt due to arthritis. (AR 72.) She has not had any injections for her knees. (AR 72.)

She also takes medication for depression and anxiety that help a little bit. (AR 51.) Her psychiatrist is working to adjust her medications. (AR 51.) Sometimes she has trouble sleeping from her medications and sometimes she cannot sleep enough. (AR 51-52.) The doctor has adjusted her medication trying to find the right combination. (AR 52.) Her doctor does not want to give her more narcotics and wants to explore other medications but they have not started anything yet. (AR 52.)

Plaintiff had physical therapy after her shoulder surgery. (AR 52.) It helped for about six months. (AR 52.) There is nothing they can do to fix her shoulder. (AR 53.) The University of California San Francisco recommended more physical therapy, but Plaintiff has not done it. (AR 53.) She does not think that it is helpful and it is painful. (AR 53.) Plaintiff had injections for pain in her back, heels, wrists, and the elbow of her right arm. (AR 53.) Sometimes it helps but not for as long as they say it should. (AR 53.) But it did help for a week or two. (AR 53.) The injection in her wrist was done incorrectly and was very painful. (AR 53.) Plaintiff has a carpal tunnel brace for her wrist that she uses when she sleeps. (AR 53.) She does not have any assistive devices. (AR 54.)

Plaintiff has tendinitis and uses carpal tunnel splits to rest the tendons. (AR 56.) They have not recommended surgery for her wrists. (AR 56.) Plaintiff cannot sit for long periods of time because her back hurts and she has to move. (AR 63.) She can sit for one to two hours

before having to stand up.  (AR 63.)  Plaintiff can stand for one half to one hour before having to sit down.  (AR 63.)  Plaintiff can walk several blocks.  (AR 63.)  Plaintiff can lift and carry about fifty pounds, but cannot lift it above her shoulders.  (AR 63.)  She last lifted 40-50 pounds the prior month when she had to get dog food out of the car and carry it into the house.  (AR 68-69.)  She lifted the bag from the car into her daughter's stroller and pushed it into the house.  (AR 69.)  Plaintiff can comfortably lift 20 pounds.  (AR 69-70.)  Plaintiff has trouble using her right arm in general.  (AR 63.)  She gets a sharp, shooting pain and has been tested but it is not carpal tunnel.  (AR 64.)

She has trouble gripping with her right hands and will have to put things down.  (AR 64.)  Plaintiff has trouble holding a pen and writing for a long period of time.  (AR 68.)  She has trouble picking up heavier items, but not as much difficulty when she uses both hands.  (AR 68.)  When she cuts a lot of food her wrist, and often her elbow, will hurt.  (AR 64.)  Plaintiff is able to button and zip.  (AR 64.)  She can use a key board but not for long periods of time because a lot hurts her wrist.  (AR 64.)  Plaintiff can raise her right arm over her head, but cannot do it for long and cannot lift.  (AR 65.)  Every once in a while, her left wrist will hurt, but mainly it is her right arm.  (AR 65.)

During an eight out workday, Plaintiff can sit for four hours, stand for two hours, and walk for two hours for short periods of time.  (AR 65.)  Plaintiff can use a keyboard for 20 minutes and then her right wrist hurts.  (AR 66.)  She would need to stop for 15 minutes.  (AR 66.)

Plaintiff sees a psychiatrist and a therapist.  (AR 54.)  She was hospitalized with mental issues in 2006 or 2007.  (AR 54.)  She has difficulty remembering dates and specifics.  (AR 56.)  Plaintiff does remember to take her medications.  (AR 56.)  She takes them in the morning when she wakes up and at night before she goes to bed.  (AR 56.)  She does not have any medication prescribed to take during the day.  (AR 56.)  Plaintiff gets easily distracted and has trouble concentrating.  (AR 56.)  A lot of stuff is going on in her head and she will be doing something and then remember she needs to do something else.  (AR 56.)  Plaintiff can follow simple one and two step instructions.  (AR 57.)  When she was taking cosmetology classes she would often

leave early and it took her longer to graduate than the other students.  (AR 72-73.)  She had to complete 1,600 hours to graduate and while it usually takes one year, it took her a year and a half.  (AR 73.)  It was not her concentration that caused her to have problems, it was being around all the different females and being tired and needing a break.  (AR 73.)  Plaintiff is able to do things, just not to do them all day.  (AR 73.)  She can do something for one day, but could not do it every day.  (AR 73.)

Plaintiff is indecisive and then when she finally makes a decision questions whether it was the right one.  (AR 57.)  Plaintiff has trouble getting along with people because she is easily offended and offends other people easily.  (AR 57.)  Plaintiff has multiple mood swings daily.  (AR 58.)  The mood swings range from being mad and crying to being curled up in a ball and not being able to speak or be spoken to.  (AR 67.)  This occurs a couple times a day.  (AR 67.)  Usually the mood swings are worse around her menstrual cycle.  (AR 67.)

Plaintiff has constant pain all the time every day.  (AR 55.)  She has multiple areas that hurt so if one is not hurting another is.  (AR 55.)  She has pain in her feet, lower back, shoulders, and right arm.  (AR 55.)  When she is hurting badly she does as little as possible.  (AR 55.)  Activity makes her pain worse.  (AR 55.)  She loves fishing and can cast and reel it in a few times and then her wrist will be sore.  (AR 55.)  She would love to walk her dog, but if she does she is in so much pain afterward that it is not worth it.  (AR 55.)

A vocational expert ("VE"), Cheryl Chandler, also testified at the hearing.  (AR 74-82.)

**B.      ALJ Findings**

The ALJ denied Plaintiff's implied request for reopening the prior decision.  (AR 20.)  He found that the principles of res judicata applied, and while he would consider the record from December 12, 2010 forward, any reference before December 12, 2010, would be for longitudinal purposes and was not a de facto reopening.  (AR 21.)

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

- Plaintiff has not engaged in any substantial activity since the alleged onset date of April

1, 2010.

- Plaintiff has the following severe impairments: major depressive disorder, anxiety disorder, right shoulder degenerative joint disease status-post stabilization surgery, fibromyalgia, asthma, rheumatoid arthritis, degenerative disc disease, and obesity.

- Plaintiff does not have an impairment or combination of impairments that meet or medical equal the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work, including the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours; sit for 6 hours in an 8-hour workday with normal breaks. Plaintiff is precluded from reaching with her right upper extremity. Plaintiff must avoid concentrated exposure to fumes, odors, dusts, and gases. Plaintiff is limited to simple, routine tasks, with limited public contact, in a setting in which interpersonal contact is incidental to work performed, and with simple, direct, and concrete supervision.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on May 13, 1982, and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not she has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability from April 1, 2010 through the date of decision.

(AR 23-33.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant

must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a

conclusion." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 955 (9th Cir. 2002) (quoting <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." <u>Hill</u>, 698 F.3d at 1159 (quoting <u>Robbins v. Social Security Administration</u>, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons to reject the testimony of Dr. Khalifa and as an examining physician his opinion is entitle to more weight than the agency physicians. Plaintiff contends that the ALJ rejected the opinion of Dr. Nomicos because it was inconsistent with her daily activities, arguing the ALJ inconsistently found that Plaintiff's daily activities were limited. Plaintiff also argues that the ALJ erred by failing to identify how her daily activities are inconsistent with the opinion of Dr. Nomicos. Finally, Plaintiff argues that the ALJ erred by failing to provide clear and convincing reasons to reject her symptom testimony.

Defendant counters that Plaintiff has failed to show that the ALJ's erred by rejecting Dr. Khalifa's opinion because the ALJ incorporated Plaintiff's mental limitations into the residual functional capacity and there is substantial evidence in the record to support the findings. Defendant argues that the ALJ did not err in rejecting the opinion of Dr. Nomicos because the medical evidence and objective findings did not support the limitations opined and the limitations were belied by her ability to care for a newborn by herself and her admitted daily activities. Finally, Defendant argues that the ALJ provided valid and specific reasons to find Plaintiff's symptom testimony not entirely credible.

///

**A.    Medical Opinions**

Plaintiff argues that the ALJ erred by rejecting the opinions of physicians, Dr. Khalifa and Dr. Nomicos.  Defendant counters that the ALJ properly evaluated the medical evidence and provided specific and legitimate reasons to reject the physicians' opinions.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.  Thomas, 278 F.3d at 957.

1.    Dr. Khalifa

Plaintiff argues that the ALJ improperly rejected the opinion of Dr. Khalifa that Plaintiff would have difficulties with social functioning and adaption.  Defendant argues that the treatment records and mental status examination findings support the ALJ's limitations regarding Plaintiff's mental functioning.

The ALJ gave Dr. Khalifa's opinion limited weight regarding social functioning and adaption because because Plaintiff was able to work in an environment with limited interpersonal interaction/public contact and with simple, direct, and concrete supervision.  (AR 30.)  The ALJ found this was consistent with Plaintiff's moderate difficulties in social functioning,

concentration, and pace.  (AR 30.)

Although the ALJ gave limited weight to Dr. Khalifa's opinions regarding Plaintiff's difficulty accepting instructions, performing work activities, maintaining regular attendance, or dealing with the stress in the work place, the ALJ did not reject the findings.  The ALJ found that despite these difficulties, Plaintiff retained the ability to work in an environment with limited interpersonal interaction/public contact and with simple, direct, and concrete supervision.  (AR 30.)  In coming to this conclusion, the ALJ relied on the opinions of the agency physicians, who considered Dr. Khalifa's consultative examination findings and the record as whole in developing a residual functional capacity assessment for Plaintiff.

The ALJ gave substantial weigh to the opinions of Dr. Daugherty and Dr. Hilliard because they were generally consistent with the medical record and overall evidence.  (AR 31.)

Dr. Daugherty opined that Plaintiff had mild restrictions in her activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace.  (AR 90, 105.)  Dr. Daugherty completed a mental residual functional capacity assessment on November 19, 2013.  (AR 93-94, 108-111.)  Dr. Daugherty considered that on September 1, 2013, Plaintiff reported that she lived with her boyfriend and daughter and cares for her daughter and pets with help.  (AR 95, 110, 299-300.)  Plaintiff alleged that her sleep was affected and she required reminders and company, but she prepares simple meals, does laundry with help, goes out alone, drives, shops, manages money.  (AR 95, 110, 300-302.)  Upon review of the medical record, Dr. Daugherty found that Plaintiff had moderate symptoms.  (AR 95, 110.)

Dr. Daugherty considered a clinical assessment performed by Ms. Medina, a social worker, on January 25, 2013, which indicated Plaintiff has moderate symptoms.  (AR 95, 110, 537-541.)  Ms. Medina noted that Plaintiff was alert and made good eye contact.  (AR 538.)  Plaintiff's attitude was cooperative and suspicious, and her behavior was unremarkable.  (AR 538.)  Plaintiff's mood was angry, sad, and worried; affect was congruent and appropriate to situation.  (AR 539.)  Plaintiff's speech was spontaneous, and normal in rate, tone, amount, clarity.  (AR 539.)  Her thought processes were logical; and thought content was suspicious and

depressive. (AR 539.) Plaintiff had no delusional thought content and perception was normal. (AR 539.) Plaintiff was oriented to person, place, time, day/date/year. (AR 540.) Her ability to concentrate impaired; but Plaintiff was attentive. (AR 540.) Her immediate memory, recent memory and remote/long term memory were good. (AR 540-541.) Abstraction was normal; insight was fair; and judgment was good. (AR 541.)

Dr. Daughterty also considered Dr. Khalifa's consultative examination on November 2, 2013, which indicated that Plaintiff's limitations are moderate. (AR 95, 110.) Dr. Khalifa conducted a comprehensive psychiatric examination of Plaintiff on November 2, 2013. (ECF No. 528-531.) Dr. Khalifa found that Plaintiff's concentration was intact; and persistence and pace were good. (AR 529.) Plaintiff was cooperative with good eye contact. (AR 529.) She was pleasant and she was tearful at times. (AR 529.)

Plaintiff's speech was goal directed with a normal pattern. (AR 529.) There was no flight of ideas or loosening of associations. (AR 529.) Her thought content was mostly about her molestation as a child and depressive symptoms and anxiety. (AR 529.) She had no suicidal or homicidal thoughts, and no psychotic symptoms. (AR 529.) Plaintiff's mood was dysphoric,[2] and affect was depressed. (AR 529.) Plaintiff was alert and oriented in all spheres, and her memory was intact. (AR 530.) She was able to do serial 7s well. (AR 530.) Concentration was intact but abstract thinking was poor. (AR 530.) Judgment and insight were intact. (AR 530.) Plaintiff was found to have a Global Assessment of Function ("GAF") Score of 55-60.[3] (AR 530.)

Dr. Khalifa stated that Plaintiff presented with depressive symptoms and anxiety symptoms and some anger. (AR 530.) He opined that Plaintiff should be able to manage her

---

[2] Mood of general dissatisfaction, restlessness, depression, and anxiety. Stedman's Medical Dictionary 599 (28th Ed. 2006).

[3] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)). "A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Cornelison, 2011 WL 6001698, at 4 n.6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34).

fund and perform simple tasks. (AR 530.) Plaintiff will have difficulty performing detailed tasks because of her depressive symptoms anxiety symptoms anger issues and limited social skills. (AR 530.) Dr. Khalifa opined that for these reasons, Plaintiff will have difficulty accepting instructions, performing work activities, or maintaining regular attendance, or dealing with the stress in the work place. (AR 531.)

Dr. Daugherty found no evidence that Plaintiff was limited in her ability to carry out very short and simple instructions. (AR 94, 109.) Plaintiff was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, and to sustain an ordinary routine without special supervision. (AR 94, 109.) There was no evidence that Plaintiff was impaired in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them, or to make simple work-related decisions. (AR 94, 109.)

Dr. Daugherty found that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, but there was no evidence that she was limited in her ability to interact with the public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavior extremes, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (AR 94, 109.)

Dr. Daugherty found that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (AR 95, 110.) There was no evidence that Plaintiff was limited in her ability to be aware of normal hazards and to take appropriate precautions; or to travel in unfamiliar places or use public transportation. (AR 95, 110.)

Dr. Daugherty opined that Plaintiff can perform work where interpersonal contact is incidental to work performed, for example assembly work; complexity of tasks is learned and performed by rote, with few variables and little judgment; and supervision required is simple, direct, and concrete (unskilled). (AR 95, 109-110.)

On reconsideration, Dr. Hilliard considered that Plaintiff has a history of long-standing depression for which she has been and continued to be in psychiatric treatment. (AR 125.) Her activities of daily living are adaptive. (AR 125.) Plaintiff relies on her daughter and friend for assistance primarily because of pain. (AR 125.) Plaintiff cooks, drives, shops, does household chores, and goes out alone. (AR 125.) Plaintiff continues to be in regular psychotherapy and takes medications for depression. (AR 125.) Dr. Hilliard opined that Plaintiff is capable of performing simple, repetitive tasks with limited public contact. (AR 125.)

Dr. Hilliard found that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special instruction, sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and ability to make simple work-related decisions. (AR 128-129.) Plaintiff was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for for extended periods; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 128-129.)

Plaintiff was not significantly limited in her ability to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (AR 129.) Plaintiff was moderately limited in her ability to interact with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 129.) Plaintiff had some limitations in her ability to deal with the public due to some anxiety symptoms in social situations. (AR 129.)

Dr. Hilliard found Plaintiff to be not significantly limited in her ability to be aware of normal hazards and take appropriate precautions; ability to travel to unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (AR 129.) Plaintiff was moderately limited in her ability to respond appropriately to changes in

the work setting.  (AR 129.)

Upon review of the medical records, Dr. Hilliard opined that Plaintiff is capable of performing simple, repetitive task with limited public contact.  (AR 130.)  Both Dr. Daugherty and Dr. Hilliard considered Dr. Khalifa's opinion that Plaintiff would have difficulty accepting instructions, performing work activities, or maintaining regular attendance, or dealing with the stress in the work place and determined that she retained the ability to work with limitations on contact with others.  This is substantial evidence to support the ALJ's determination that Plaintiff retains the ability to perform simple, routine tasks, with limited public contact, in a setting in which interpersonal contact is incidental to work performed, and with simple, direct, and concrete supervision.

By citing certain evidence in the record, Plaintiff argues that the ALJ erred because he ignores the evidence that supports the severity of her mental impairments.  However, upon review of the record, there is substantial evidence to support the ALJ's finding that the objective medical evidence supports the opinions of Dr. Daugherty and Dr. Hilliard.  While there are occasions, where Plaintiff complained of symptoms of depression and anxiety, (AR 390, 444, 462, 464, 472, 480, 497, 507, 577, 580, 592, 596, 829, 834, 905, 1081), Plaintiff also denied having psychiatric symptoms, (AR 375, 396, 444, 480, 481, 513, 516, 519, 588, 555, 855, 862, 866, 873, 877, 887, 891, 899, 907, 911, 915, 927, 935, 938, 943, 945, 959).  There are a few instances where objective psychiatric findings are noted (AR 454,[4] 529, 577), but the objective findings consistently reflect no mental findings or normal mental status findings, (AR 372, 374, 376, 385, 383, 396, 406, 407-408, 411, 413, 417, 419, 425, 437, 439, 442, 445, 456-457, 460, 463, 465, 472, 478, 482, 487, 491, 495, 498, 501, 509, 581, 584-585, 588, 592, 596, 613, 620, 630, 657, 709, 718, 728, 737, 746, 754, 755, 766, 781, 830, 835, 841, 855, 862, 866, 870, 873, 883, 887, 891, 895, 899, 907, 912, 915-916, 918, 924, 931-932, 935, 938, 943, 945, 959, 965, 970, 976, 1082).

---

[4] On November 9, 2011, the record notes that Plaintiff was not alert and was not oriented to time, place, and person. However, the objective findings all relate to the purpose of the visit which is a lesion and there is no further mention of treatment for mental issues.  Therefore, it appears that this may be a typographical error.

Finally, while Dr. Shave and Mr. Pippin noted depression anxiety and other mood symptoms, (AR 1094, 1132), review of the treatment notes reflect generally normal objective mental status findings (AR 1096, 1100, 1102, 1104, 1106, 1108, 1110, 1112, 1114, 1118, 1122).

Substantial evidence supports that ALJ's finding that Plaintiff retains the ability to perform simple, routine tasks, with limited public contact, in a setting in which interpersonal contact is incidental to work performed, and with simple, direct, and concrete supervision. The ALJ did not err in evaluating the mental health opinions.

2. Dr. Nomicos

Plaintiff argues that the ALJ's opinion is inconsistent because the ALJ stated that Plaintiff's daily activities were fairly limited. However, in the opinion the ALJ found that Plaintiff's allegations of the extent of the limitations to her daily activities were not credible. Therefore, using Plaintiff's daily activities to discredit the opinion of Dr. Nomicos is not inconsistent with the ALJ's credibility findings.

The ALJ considered that

> On September 15, 2015 treating physician Nicholas Nomicos, M.D. opined that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for two hours and sit for four hours in an eight-hour day. She would be absent four or more days per month. [AR 1075.] This opinion was given limited weight except for lifting and carrying restrictions because it was inconsistent with the claimant's activities of daily living and her ability to care for a newborn.

(AR 30.)

Plaintiff argues that the ALJ's explanation lacks objective support in the record because the ALJ did not explain how her ability to care for a new born and limited daily activities are inconsistent with Dr. Nomicos' opined limitations. Defendant argues that there is substantial evidence in the record to support the residual functional capacity.

Dr. Nomicos completed a Physical Medical Source Statement on September 15, 2015. (AR 1074-1075.) The statement was based on the diagnosis of chronic back pain, morbid obesity, chronic anxiety, and depression. (AR 1074.) Dr. Nomicos stated that Plaintiff's symptoms included persistent pain to her back, knees, and feet, and anxiety/depression. (AR 1075.) Plaintiff had pain in her back, shoulders, and leg daily that affected her activity level.

(AR 1075.) The objective findings that supported the opinion were changes seen on back x-rays. (AR 1075.) Plaintiff had emotional factors that contribute to the severity of her symptoms and limitations. (AR 1075.)

Plaintiff could walk approximately 1 to 2 city blocks; sit for 20 minutes at one time; stand for 20 minutes at one time; and sit for 4 hours and stand/walk about 2 hours in an 8-hour day. (AR 1075.) Plaintiff would need to shift positions, and to walk around for 5 minutes every 30 minutes during the day. (AR 1075.) Plaintiff needs 2 to 3 unscheduled breaks per hour; and must rest 5 to 10 minutes before returning to work. (AR 1075.) Dr. Nomicos did not identify symptoms that cause need for breaks. Plaintiff can lift 10 pounds frequently, and 20 pounds occasionally. (AR 1075.) She can rarely twist, stoop/bend, crouch, or squat; and occasionally climb stairs; but never climb ladders. (AR 1075.) Plaintiff had no significant fingering limitation. (AR 1075.)

Plaintiff would be off task 20 percent of day due to interference with attention and concentration. (AR 1075.) She is able to tolerate moderate stress work. (AR 1075.) She is likely to have good and bad days, and would miss 4 or more days per month. (AR 1075.)

While Plaintiff testified that she had physical limitations, she also testified that she drives every day and picks her daughter up after school almost every day which is a fifteen-minute drive each way. (AR 44, 71.) She takes care of her, at that time nine-month old daughter, while her husband is at work and her older daughter is at school. (AR 44, 58.) During the day, she feeds her daughter, feeds the cats and the dogs, does the dishes and laundry and other things that need to be done. (AR 58.) She will go to doctor's appointments when she has one. (AR 58.) She makes dinner with the help of her twelve-year old daughter, although her daughter will give the baby her bath. (AR 58.) She does not nap during the day because of the baby. (AR 59.) Plaintiff also testified that it was not so much her physical issues that keep her from working but her mental issues. (AR 70.) She prepares meals, does the dishes, cleans the floor with a dust buster, and cleans the bathrooms. (AR 59-60.) Plaintiff pays the bills and goes grocery shopping with her husband or daughter. (AR 60.) She takes her daughter to girl scouts, usually just dropping her off. (AR 61.) Plaintiff is laying down or sitting with her feet up at least half

the day and has the television on and is watching television or paying bills. (AR 71.)

Plaintiff also testified that she has dinner with her husband's family, and goes out to restaurants on occasion. (AR 61.) She goes tent camping once a year on the San Joaquin River, and goes fishing a couple times a year. (AR 66.) She is able to cast and reel in a few times before her wrist will be sore. (AR 55.) Plaintiff occasionally takes walks around the neighborhood or to the park. (AR 62.) She uses her computer to shop, pay her bills, and manage her checking account. (AR 62.)

Plaintiff argues that the record contains no information about the childcare activities and reliance upon the fact that she cares alone for her baby was improper. However, the evidence in the record demonstrates that Plaintiff cared for her nine-month old daughter without assistance while her husband was at work and her older daughter was at school. While Dr. Nomicos testified that Plaintiff would be off task 20 percent of day due to interference with attention and concentration (AR 1075), Plaintiff's ability to care for her infant daughter by herself while her other family members are at school and work contradicts the severe mental limitation opined. But the daily activities and her ability to care for an infant are not inconsistent with the exertional limitations opined by Dr. Nomicos.[5] Defendant argues that there is substantial evidence to support the finding that Plaintiff is able to perform light work.

Here, Dr. Nomicos and Plaintiff both stated that she could sit a total of four hours, walk and or stand a total of two hours each in an eight-hour workday. Dr. Nomicos opined that Plaintiff can only sit for 20 minutes at one time (AR 1075), however, Plaintiff testified that she can sit for one to two hours before having to stand up (AR 63). Dr. Nomicos opined that Plaintiff can only sit for 20 minutes at one time (AR 1075), but Plaintiff testified that she can stand for one half to one hour before having to sit down (AR 27, 63). Dr. Nomicos opined that Plaintiff can lift 10 pounds frequently, and 20 pounds occasionally (AR 30, 1075), but Plaintiff testified that she can lift 40 to 50 pounds and can comfortably lift 20 pounds (AR 27, 63, 68-69,

---

[5] While in this instance the Court is finding that the reason provided by the ALJ is not a specific and legitimate reason to reject the physical limitations opined, the Court does not imply that the ALJ must provide reasons to reject a certain portion of or all of the limitations opined. The finding here is based on a review of the record as a whole and the inadequacy of the reasons cited by the ALJ in the specific circumstances presented here.

69-70). Plaintiff also testified that it is not really her physical symptoms that prevent her from working. (AR 27, 70.) While these inconsistencies would be a specific and legitimate reason to reject Dr. Nomicos' opinion, the ALJ only relied on Plaintiff's daily activities and ability to care for a newborn.

Further, as Defendant points out, the ALJ did discuss that the objective evidence did not support Plaintiff's alleged limitations (AR 28), but he did not use the objective evidence as a reason to discredit the opinion of Dr. Nomicos. The Court cannot consider Defendant's post hac rationalizations. "A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991).

Finally, Defendant contends that any error was harmless as all of the opinions demonstrate that Plaintiff retained the ability to do light work.[6] However, the ALJ never presented a hypothetical to the VE with an individual who had the standing, walking, and sitting limitations contained in Dr. Nomicos' opinion. The ALJ did present a hypothetical of an individual capable of occasionally lifting and carrying ten pounds and frequently less than ten; stand and/or walk for two hours and sit for six to eight hours with normal breaks; no overhead reaching with the right upper extremity who needs to avoid concentrated exposure to fumes odors dust and gasses. (AR 80.) The individual is capable of simple routine tasks but limited public contact in a setting where interpersonal contact is incidental to work performed and is limited to simple direct and concrete supervision. (AR 80.) The VE opined that there are jobs available in the national economy that this individual can perform. (AR 80-81.) However, the sitting limitation is greater than either Plaintiff or Dr. Nomicos proffered as her limitation. Therefore, there is no evidence in the record that there is work available in the national economy

---

[6] The Court notes that in this action the ALJ did an excellent job in setting forth the daily activities which it appears he believed demonstrated that Plaintiff retained the functional capacity to work. However, the Court also notes that frequently in such situations where it appears obvious to the ALJ that the individual is not disabled, the ALJ fails to state sufficient reasons to reject the medical opinions in the record or the plaintiff's testimony based on those daily activities. Defendant then argues the other evidence in the record that supports the ALJ's opinion. In such a situation, it is unclear to the Court why Defendant does not remand the action with instructions to the ALJ to address those reasons in his opinion, rather than asking the Court to consider these post hac rationalizations on appeal which it cannot do.

1  that Plaintiff can perform if her limitations are sitting 4 hours, and standing or walking 2 hours
2  each in an 8-hour workday.

3  This action shall be remanded for further administrative proceedings for the ALJ to
4  further address Plaintiff's functional limitations and whether there are jobs in the national
5  economy that she can perform with those limitations.

### B.    Plaintiff's Credibility

7  "An ALJ is not required to believe every allegation of disabling pain or other non-
8  exertional impairment." Orn, 495 F.3d at 635 (internal punctuation and citations omitted).
9  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible,
10  requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th
11  Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical
12  evidence of an underlying impairment which could reasonably be expected to produce the pain
13  or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)
14  (internal punctuation and citations omitted). This does not require the claimant to show that her
15  impairment could be expected to cause the severity of the symptoms that are alleged, but only
16  that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

17  Then "the ALJ may reject the claimant's testimony about the severity of those symptoms
18  only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v.
19  Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that
20  support this conclusion and the findings must be sufficiently specific to allow a reviewing court
21  to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not
22  arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.
23  2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a
24  claimant's subjective pain and symptom testimony include the claimant's daily activities; the
25  location, duration, intensity and frequency of the pain or symptoms; factors that cause or
26  aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other
27  measures or treatment used for relief; functional restrictions; and other relevant factors.
28  Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ

may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

1.    Daily Activities

Plaintiff argues that the ALJ improperly rejected her testimony. Defendant argues that the ALJ gave less weight to Plaintiff's allegations of disability because they were inconsistent with her conduct and activities.

There are two grounds to use daily activities for an adverse credibility finding. Orn, 495 F.3d at 639. First, daily activities can form the basis of an adverse credibility determination if the claimant's activity contradicts his testimony. Id. at 639. The ALJ must make specific findings as to the daily activities and their transferability to conclude that the claimant's daily activities warrant an adverse credibility determination. Id. Secondly, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.' " Id. (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

Here, the ALJ set forth a detailed discussion of Plaintiff's daily activities.

On September 1, 2013, the claimant completed a function report and reported that she lived with her boyfriend and daughter. She reported that with help she cared for her daughter and a dog. She prepared simple meals; did laundry with help; went out alone; drove; shopped; and managed money. She had problems with lifting, stair climbing, using hands, standing, kneeling, seeing, memory, following instructions, walking, squatting, understanding, concentration, reaching, completing tasks, and getting along with others. She did not handle changes in routine well. She used a prescribed brace eyeglasses and contacts. [AR 299-306.]

(AR 26.)

The claimant testified that on a typical day she took care of her daughter and fed her breakfast. She fed the cats and dogs. She did dishes and laundry. She went to doctor's appointments. She got dinner done with the help of her 12-year-old

daughter. Her older daughter gave the baby a bath. She cared for her younger daughter while her older daughter was in school and her husband was working. She could handle caring for her daughter by herself. For the past two months on Latuda she said she was knocked out but she did not wake when the baby cried. She slept for six hours and she did not normally nap. She prepared meals and washed dishes. She cleaned the bathroom. She paid bills and she went shopping with her daughter or husband. She took her older daughter to Girl Scouts. She spent time with family. She went to restaurants more than to movies. She went tent camping once a year on the San Joaquin River. She went fishing a couple of times a year. She took walks occasionally. She used the computer for shopping and paying bills. Her hobbies were making bows, sewing, cross-stitch, reading, and crafts. It bothered her to sit for a long time because her back hurt and she had to stand. . . . She had to pick her daughter up from school daily.

(AR 27.)

The ALJ considered Plaintiff's allegations regarding her activities of daily living and found that while she described activities of daily living that were fairly limited, the allegations were not strong evidence to find her disabled. (AR 27.) The ALJ found that Plaintiff's description of fairly limited daily activities could not be objectively verified with any reasonable degree of certainty and that it was difficult to attribute that degree of limitation to her medical condition as opposed to other reasons. (AR 27.) However, these are not clear and convincing reasons to reject a claimant's symptom testimony.

Defendant argues that the ALJ found that Plaintiff's symptom allegations were inconsistent with her conduct and activities. The ALJ stated a wide range of activities that could indicate that Plaintiff was not as limited as she alleged, but the ALJ never made such a finding or identified any specific activities that contradicted Plaintiff's testimony. Merely setting forth Plaintiff's activities is not sufficient to make the specific findings to support the ALJ's conclusion which allow the "reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885.

The reasons provided by the ALJ to reject Plaintiff's testimony based on her daily activities are not clear and convincing reasons to reject her symptom testimony.

2. Treatment

Plaintiff argues that the ALJ failed to indicate how her symptom testimony is inconsistent with her course of treatment. Defendant counters that the ALJ properly considered that

Plaintiff's allegations were undermined by the lack of evidence of more aggressive treatment or hospitalizations for her allegedly disabling conditions.

The ALJ considered that Plaintiff alleged inability to engage in competitive work activity beginning on April 1, 2010 due to bipolar disorder, depression, fibromyalgia, and tendinitis. (AR 26, 83, 99.) Plaintiff testified that she had pain every day all of the time. She had constant pain in her feet, lower back, shoulder, and right arm. (AR 26, 55.) She had memory issues, poor concentration, got distracted easily, has problems making decisions, mood swings every day, and problems getting along with other people. (AR 26-27, 50.)

> The claimant testified she could sit for 1-2 hours before she had to stand. She could stand for 30-60 minutes. She could walk a few blocks. She could lift 50 pounds but not above shoulders. She could carry 50 pounds but it depended on how far. She had problems with her right arm in general. [AR 63.] When she was pregnant, she received shots in her elbow for tendinitis. She had shooting pain in her right hand. She had trouble gripping. [AR 64.] She could use a keyboard but not for a long time. She could not raise her right arm overhead. [AR 64-65.] Her right shoulder would pop out if she raised anything above her head. [AR 65.] In an eight-hour day, she could sit for four hours, stand for two hours, and walk for two hours. [AR 65.] She could use a keyboard for 20 minutes at a time. [AR 64, 66.] She had trouble holding a pen for a long time. [AR 68.] She could lift and carry 20 pounds. [AR 69-70.] She was having more trouble mentally than physically. [AR 70.] She reclined for half the day. . . . [AR 71.] She had cervical spine issues. She had lower back pain. She had problems with both knees due to arthritis. [AR 72.] She did not have injections. [AR 72.] She had problems with concentration. [AR 56.]

(AR 27.)

The ALJ found that Plaintiff had received physical therapy and surgery for right shoulder pain and instability. (AR 28.) But the ALJ found that Plaintiff received limited treatment for degenerative disc disease, asthma, rheumatoid arthritis, and history of fibromyalgia. (AR 28.) Plaintiff had been treated on an outpatient basis for her asthma and there was no evidence of aggressive treatment, including emergency room visits or admissions. (AR 28.) Plaintiff had received treatment for her rheumatoid arthritis, but there was no evidence of aggressive treatment for her fibromyalgia. (AR 28.)

As to Plaintiff's asthma, the medical record does have references that Plaintiff had exercised induced asthma (AR 368, 390), but that it is under good control. (AR 521.) However, Plaintiff did not testify that her asthma prevented her from working.

Plaintiff did allege that she was limited in her ability to sit, stand and walk due to pain.

The ALJ found that Plaintiff had received limited treatment for her degenerative disc disease, rheumatoid arthritis, and history of fibromyalgia. However, the ALJ did not set forth the "limited" treatment that Plaintiff had received or otherwise identify what "limited" treatment contradicted Plaintiff's allegations. Defendant argues that Plaintiff improved with medication, received only conservative treatment for her symptoms, and there is a lack of objective medical evidence to support her allegations. However, the ALJ only addressed the objective medical evidence in considering Plaintiff's physical examinations.

The ALJ did address that Plaintiff only received limited treatment for her depressive and anxiety disorders. (AR 28.) He also noted that Plaintiff reported that her anxiety did not interfere with her social or work activities. (AR 28.) During her pregnancy, Plaintiff took Wellbutrin and remained stable. (AR 28.) Plaintiff was aware of the responsibilities of caring for her newborn, reported no psychological symptoms, and was able to care for her newborn. (AR28-29.) The ALJ provided clear and convincing reasons to reject Plaintiff's symptom testimony as to her mental symptoms.

The Court does not imply by this finding that in every instance the ALJ must separately provide specific reasons to reject the physical and the mental symptoms. However, based upon the ALJ's opinion in this instance, that ALJ did not identify the "limited" treatment that Plaintiff received for her physical symptoms. Therefore, the Court is unable to conclude that Plaintiff's testimony was rejected on permissible grounds and that the ALJ did not arbitrarily discredit her testimony. Moisa, 367 F.3d at 885.

3. Objective Medical Evidence

There is substantial evidence in the record to support the finding that the objective medical evidence does not support Plaintiff's symptom testimony. The ALJ noted that Plaintiff had normal cervical and lumbar x-rays on October 21, 2010. (AR 28, 430, 431.) On July 21, 2015, a lumbar spine x-ray showed mild lumbar spasm and spondylosis with facet arthropathy. (AR 28, 977.) She had no muscle weakness or reduced range of motion. (AR 28.) Her gait was normal and heel and toe walking were normal. (AR 28.) Plaintiff was able to get on and off the examination table and could recline and sit without assistance. (AR 28.) She reported no

neurological or psychological symptoms.  (AR 28.)  Plaintiff was treated for rheumatoid arthritis, but had no synovitis of her joints.  (AR 28, 409, 511, 513-514.)  Plaintiff had a history of fibromyalgia and complaints of arthralgias and myalgias.  (AR 28.)  But there was no evidence of joint deformities or a defined number of tender points and no evidence of aggressive treatment.  (AR 28.)

While review of the record generally demonstrates that Plaintiff had essentially normal physical examinations or no findings regarding her back pain, fibromyalgia, or arthritis, there are medical records demonstrating some findings.

On May 5, 2010, Plaintiff had a normal physical examination.  (AR 413.)  Dr. Kim noted that Plaintiff may have symptoms of fibromyalgia and she was advised to lose weight and exercise.  (AR 413.)  On October 8, 2010, Plaintiff had a normal examination and was advised to lose weight as this may be part of the problem with her joint pain.  (AR 425.)

On June 13, 2013, Plaintiff was seen by a physician's assistant.  (AR 504-505.)  Cervical spine pain was elicited by motion, the thoracolumbar spine showed pain elicited by motion, and the lumbar/lumbosacral spine exhibited showed pain elicited by motion.  (AR 505.)  Plaintiff was exquisitely tender in most pressure points and all along both tibias and was diagnosed with fibromyalgia.  (AR 505.)

The next finding in these areas are not until January 24, 2014, Plaintiff reported pain, swelling and stiffness in her joints.  (AR 586.)  There were findings of tenderness on palpation and abnormal motion in the shoulder, hip, and knees.  (AR 588.)  Plaintiff's ambulation was not limited and she did not require an assistive device.  (AR 588.)  There was no musculoskeletal crepitus observed.  (AR 588.)  Plaintiff's gait and stance were normal.  (AR 588.)

Plaintiff was seen on February 5, 2014, and February 24, 2014, with similar complaints and examination revealed the same findings.  (AR 590-592, 594-596.)  Plaintiff became pregnant and on August 5, 2014, reported a headache with no other problems and no musculoskeletal symptoms.  (AR 958.)  Plaintiff continued to report no musculoskeletal symptoms during her pregnancy.  (AR 911, 915, 918, 927, 934, 938, 945.)

On January 14, 2015, Plaintiff reported that she was having low back pain that was

causing difficulty sleeping, pain in her tailbone, and stiffness in the lower region.  (AR 905.)  Her lower back and thoracolumbar spine exhibited tenderness on palpation.  (AR 907.)  Plaintiff was ambulating without an assistive device.  (AR 907.)

On February 13, 2015, Plaintiff reported no muscle weakness but low back pain that was radiating.  (AR 897.)  Plaintiff was able to stand erect and had no gait abnormality or numbness of the legs.  (AR 897.)  The lower back and thoracolumbar spine demonstrated tenderness on palpation and there was spine percussion tenderness.  (AR 899.)  Plaintiff was able to ambulate without an assistive device.  (AR 899.)

On March 13, 2015, Plaintiff complained of shoulder pain.  (AR 889.)  Plaintiff had tenderness on palpation of the shoulders, but normal motion.  (AR 891.)  The cervical spine showed no tenderness on palpation.  (AR 891.)

On April 8, 2015, Plaintiff reported her back symptoms were worse.  (AR 885.)  The lower back and thoracolumbar spine demonstrated tenderness on palpation.  (AR 887.)  On April 28, 2015, the record notes no back findings on examination, but Plaintiff received an injection for foot pain.  (AR 883.)

On May 26, 2015, Plaintiff reported musculoskeletal symptoms but there are no findings.  (AR 873.)  On June 2, 2015, and June 8, 2015, Plaintiff reported no musculoskeletal symptoms.  (AR 873, 870.)

Plaintiff saw Dr. Nomicos on July 7, 2015, and reported back pain that had not changed.  (AR 864.)  Her lower back and thoracolumbar spine exhibited tenderness on palpation.  (AR 866.)  Dr. Nomicos noted that Plaintiff appeared to walk normally, was able to get on and off the examination table, and was able to recline and sit without assistance.  (AR 866.)

Plaintiff saw Dr. Nomicos on August 14, 2015, and reported back pain.  (AR 860.)  Her lower back and thoracolumbar spine exhibited tenderness on palpation, and there was tenderness in the hips.  (AR 862.)  But, again it is noted that Plaintiff appeared to walk normally, was able to get on and off the examination table, and was able to recline and sit without assistance.  (AR 862.)

Plaintiff saw Dr. Nomicos on September 3, 2015, for foot pain and no gait abnormality

was noted. (AR 857.) Plaintiff saw Dr. Nomicos on September 15, 2015, to have disability forms completed. (AR 853.) Her lower back and thoracolumbar spine exhibited tenderness on palpation. (AR 8855.) Dr. Nomicos noted that Plaintiff appeared to walk normally, was able to get on and off the examination table, and was able to recline and sit without assistance. (AR 855.)

Plaintiff saw Dr. Nomicos on September 21, 2015 for a follow up on her back pain and reported pain in her foot. (AR 850.) Plaintiff had a normal physical examination other than foot pain. (AR 852.)

While Plaintiff did report some pain and there were findings in 2014 and 2015, for the majority of the period Plaintiff reported no musculoskeletal complaints and there are no objective findings to support Plaintiff's allegations of pain. There is substantial evidence in the record for the ALJ's conclusion that the objective medical evidence does not support Plaintiff's symptom testimony. However, "lack of medical evidence cannot form the sole basis for discounting pain testimony." Burch, 400 F.3d at 681. Because the ALJ failed to provide another clear and convincing reason to reject Plaintiff's testimony, this action shall be remanded. On remand, the ALJ shall properly address Plaintiff's daily activities and the "limited treatment" received by Plaintiff.

### C.    Action is Remanded for Further Administrative Proceedings

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020. The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. Id. at 1021.

Here, the record as a whole provides serious doubt that Plaintiff is in fact disabled. Plaintiff alleges that she has limitations, but her daily activities and testimony demonstrate that she is capable of a wide range of activities and she is caring for an infant by herself. Further, the objective medical evidence does not support the extent of the limitations testified to by Plaintiff or opined by Dr. Nomicos. Finally, Plaintiff testified that it is not her physical symptoms that keep her from working, it is her mental symptoms. But the record demonstrates that Plaintiff's mental symptoms are moderate and do not preclude work. For these reasons, this action shall be remanded for further administrative proceedings. On remand, the ALJ shall further address Plaintiff's credibility and functional limitations and whether there are jobs in the national economy that she can perform with those limitations.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ erred by not providing clear and convincing reasons to reject Plaintiff's credibility or specific and legitimate reasons to reject the physical limitations opined by Dr. Nomicos.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order. It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Lynda Lynn Jones and against Defendant Commissioner of Social Security. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**July 13, 2018**__          _____

UNITED STATES MAGISTRATE JUDGE